# EXHIBIT 3

**COMMONWEALTH OF KENTUCKY**
**FRANKLIN CIRCUIT COURT**
**DIVISION ___**
**CIVIL ACTION NO. ________**
***Electronically Filed***

COMMONWEALTH OF KENTUCKY, EX REL. ATTORNEY GENERAL, RUSSELL COLEMAN,

*Plaintiff*,

v.

KALSHIEX LLC,
KALSHI INC.,
KALSHI KLEAR INC.,
KALSHI KLEAR LLC,
KALSHI TRADING LLC,
ROBINHOOD MARKETS, INC.,
ROBINHOOD DERIVATIVES LLC,
WEBULL CORPORATION
and
COINBASE FINANCIAL MARKETS, INC.,

*Defendants*.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, the Commonwealth of Kentucky ("the Commonwealth" or "Kentucky"), by and through its Attorney General, Russell Coleman, brings this suit against Defendants Kalshi Inc., KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, Kalshi Trading LLC, Robinhood Markets, Inc., Robinhood Derivatives LLC, Webull Corporation, and Coinbase Financial Markets, Inc. and in support thereof states as follows:

## I. INTRODUCTION

1. As stated by Congress in the Interstate Horseracing Act: "The States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1).

92FB4D40-862E-4579-900B-6D10A3229023 : 000001 of 000056

2. In 2023, Kentucky legalized online sports betting, but it did so under a comprehensive licensing and regulatory framework designed to protect vulnerable gamblers and ensure that sports gambling revenue benefits the Commonwealth.

3. Defendants are not licensed to offer online sports wagering in Kentucky, yet they have recently entered the Kentucky online sports gambling market through what they call "prediction markets."

4. Each Defendant, through its website and mobile applications, solicits wagers on the outcomes of sporting events from Kentucky residents. While Defendants call these wagers "event contracts," they fall squarely within the definition of "sports wagering" under Kentucky law, *see* KRS 231.210(32), and any reasonable definition of gambling.

5. As Kentucky State Representative Michael Meredith stated: "This is sports wagering. If it looks like a duck and quacks like a duck, it's probably sports wagering. . . ." [1]

6. By acting as unlicensed sports wagering providers, and heavily advertising their sports wagering offerings in Kentucky, Defendants subvert Kentucky's efforts, under its sovereign authority, to control online sports gambling within its borders.

7. Through this action, Kentucky asserts its authority over online sports betting within its borders to protect the welfare of its citizens.

## II. JURISDICTION AND VENUE

8. **Subject Matter Jurisdiction:** The Franklin Circuit Court has subject matter jurisdiction over the claims stated herein because the claims arise exclusively under Kentucky statutory law and jurisdiction is not exclusively vested in another court.

[1] Kevin Hardy, *Kalshi and Polymarket are Skirting Laws on Sports Betting, States Say,* STATELINE (Mar. 6, 2026, 5:00 AM), https://stateline.org/2026/03/06/kalshi-and-polymarket-are-skirting-laws-on-sports-betting-states-say/.



92FB4D40-862E-4579-900B-6D10A3229023 : 000002 of 000056

9. **Personal Jurisdiction**: The Franklin Circuit Court has personal jurisdiction over Defendants. Each Defendant has systematically, continuously, and purposefully availed itself of the privilege of conducting business in Kentucky through their respective interactive and transactional websites and mobile apps that solicit wagers on sporting events from Kentucky residents. All asserted claims arise from this conduct.

10. **Venue:** Venue is appropriate in Franklin Circuit Court under KRS 452.460(1) because, with respect to each Defendant, the unlawful acts alleged in this action occurred in Franklin County. Further, pursuant to KRS 367.190(1), venue is appropriate in Franklin Circuit Court because this action alleges injuries against the Commonwealth, which occurred in Franklin County.

## III. PARTIES

11. Plaintiff, the Commonwealth of Kentucky *ex rel*. Russell Coleman, Attorney General, is responsible for the enforcement and administration of Kentucky law, including, but not limited to, the Kentucky Consumer Protection Act, KRS 367.110 *et seq*. (hereinafter "KCPA"). The Attorney General, in a *parens patriae* capacity, and through KRS 367.190, KRS 372.040, KRS 15.020(3), and KRS 528.100(3), is authorized to bring this action in the name of the Commonwealth of Kentucky, in its own right, and on behalf of its citizens, and has determined it is in the public interest to do so.

12. Defendant KalshiEX LLC (collectively with the other Kalshi entities referred to as "Kalshi") is a Delaware limited liability company with its principal place of business in New York, New York. KalshiEX LLC is a wholly owned subsidiary of Kalshi Inc. In concert with other Kalshi entities, KalshiEX LLC advertises and operates an online sports betting operation in the Commonwealth of Kentucky without the licensing approval of the Kentucky Horse Racing



92FB4D40-862E-4579-900B-6D10A3229023 : 000003 of 000056

and Gaming Commission ("KHRGC"). Specifically, Kalshi operates a so-called "prediction market" through which residents of Kentucky can engage in unlicensed sports gambling. This market is an online trading platform through which users may wager on the likelihood of a sports-related outcome. Kalshi conducts business across the United States, including within Kentucky, where Kalshi makes sports wagering available to residents, markets sports wagering to residents, and accepts payments through widely used financial systems accessible by Kentucky consumers. KalshiEX LLC earns revenue, directly or as a transferee, from the fees paid by Kentucky users betting on the Kalshi platform.

13. Defendant Kalshi Inc. is a Delaware corporation that maintains its principal place of business in New York, New York. Kalshi Inc. is the sole owner of Kalshi Klear Inc., KalshiEX LLC, and Kalshi Trading LLC, and acts in concert with the other Kalshi entities to advertise and operate the Kalshi sports wagering platform in Kentucky. Kalshi Inc. earns revenue, directly or as a transferee, from the fees paid by Kentucky users betting on the Kalshi platform.

14. Defendant Kalshi Klear Inc. is a Delaware corporation that maintains its principal place of business in New York, New York. Kalshi Klear Inc. is a wholly owned subsidiary of Kalshi Inc., and the sole member of Kalshi Klear LLC. Kalshi Klear Inc. acts in concert with the other Kalshi entities to operate the Kalshi sports wagering platform in Kentucky. Kalshi Klear Inc. earns revenue, directly or as a transferee, from the fees paid by Kentucky users betting on the Kalshi platform.

15. Defendant Kalshi Klear LLC is a Delaware limited liability company that maintains its principal place of business in New York, New York. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a CFTC-registered derivatives clearing organization. Kalshi Klear LLC acts in concert with the other Kalshi entities to operate the Kalshi



92FB4D40-862E-4579-900B-6D10A3229023 : 000004 of 000056

sports wagering platform in Kentucky. Kalshi Klear LLC earns revenue, directly or as a transferee, from the fees paid by Kentucky users betting on the Kalshi platform.

16. Defendant Kalshi Trading LLC is a Delaware limited liability company with headquarters in New York, New York. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a market maker for Kalshi's prediction market, buying and selling event contracts on the platform. Kalshi Trading LLC acts in concert with the other Kalshi entities to operate the Kalshi sports wagering platform in Kentucky. Kalshi Trading LLC earns revenue, directly or as a transferee, from the fees paid by Kentucky users betting on the Kalshi platform; and further earns revenue by wagering against Kentucky users betting on the Kalshi platform.

17. Defendant Robinhood Markets, Inc. is a Delaware corporation headquartered in Menlo Park, California.

18. Defendant Robinhood Derivatives LLC is a Delaware limited liability company headquartered in Menlo Park, California. It is a wholly owned subsidiary of Robinhood Markets, Inc. It is a futures commission merchant and provides options on futures trading.

19. Robinhood Markets, Inc. and Robinhood Derivatives LLC (together, "Robinhood") have partnered with Kalshi to operate—on the Robinhood investment platform—a prediction market hub, allowing Kentucky residents to engage in unlicensed sports gambling. Robinhood conducts business across the United States, including within Kentucky, where Robinhood makes sports wagering available to residents, markets sports wagering to potential users, and accepts payments through widely used financial systems accessible by Kentucky consumers.

20. Defendant Webull Corporation ("Webull") is a Cayman Islands corporation headquartered in St. Petersburg, Florida. It is a financial services company that provides an



92FB4D40-862E-4579-900B-6D10A3229023 : 000005 of 000056

electronic trading platform of the same name. Webull has partnered with Kalshi to operate—on the Webull investment platform—a prediction market hub, allowing Kentucky residents to engage in unlicensed sports gambling. Webull conducts business across the United States, including within Kentucky, where Webull makes sports wagering available to residents, markets its platform to potential users, and accepts payments through widely used financial systems accessible by Kentucky consumers.

21. Defendant Coinbase Financial Markets, Inc. ("Coinbase") is a Delaware corporation headquartered in New York, New York. It provides the Coinbase electronic trading platform. Coinbase has partnered with Kalshi to operate—on the Coinbase trading platform—a prediction market hub, allowing Kentucky residents to engage in unlicensed sports gambling. Coinbase conducts business across the United States, including within Kentucky, where Coinbase makes sports wagering available to residents, markets its platform to potential users, and accepts payments through widely used financial systems accessible by Kentucky consumers.

## IV. FACTUAL ALLEGATIONS

### A. The Legislative and Regulatory Framework for Legal Sports Wagering in the Commonwealth.

22. In 2018, the United States Supreme Court held that the Professional and Amateur Sports Protection Act was "incompatible with the system of 'dual sovereignty' embodied in the Constitution," paving the way for states to authorize sports wagering on their own terms. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 458, 486 (2018).

23. Deliberation over legalizing sports wagering in Kentucky began shortly thereafter. In a statement from February 2020, Governor Andy Beshear said, "We have an urgency to keep millions of Kentucky dollars from crossing our rivers and going to support the education and pension systems in our neighboring states. We are with business, education and pension leaders –



92FB4D40-862E-4579-900B-6D10A3229023 : 000006 of 000056

Republicans and Democrats – working together on the same team. We all agree that passing sports betting is the right thing to do and we are working together to help move the state forward."[2]

24. Three years later, on March 31, 2023, Governor Beshear signed House Bill 551, bipartisan legislation legalizing in-person and remote sports wagering across the Commonwealth.[3]

25. However, before sports wagering became available to Kentuckians in September 2023, the Commonwealth researched and implemented best practices and regulations designed to protect Kentucky's bettors, so their "bets are safe, their money is protected, and there is effective oversight and enforcement if the law is not followed."[4]

26. The Commonwealth added sports wagering to the existing jurisdiction and oversight powers of the Kentucky Horse Racing and Gaming Commission (formerly known as the Kentucky Horse Racing Corporation), which has long overseen horse racing and pari-mutuel wagering in the Commonwealth. KRS 230.361; KRS 230.260.

27. "Sports wagering" is defined as wagering on "sporting events or portions of sporting events, or on the individual performance statistics of athletes in a sporting event or combination of sporting events…." KRS 230.210(32).

---

[2] Office of the Governor, *Gov. Beshear, Other Kentucky Leaders Urge Lawmakers to Pass Sports Betting Bill* (Feb. 6, 2020), https://www.kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=42.

[3] *See* Office of the Governor, *Gov. Beshear Signs Historic Legislation Legalizing Sports Betting* (Mar. 31, 2023), https://www.kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=1730; Office of the Governor, *Gov. Beshear: Kentuckians Can Start Betting on Sports in Less Than 60 Days* (July 10, 2023), kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=1859.

[4] Office of the Governor, *Gov. Beshear: Kentuckians Can Start Betting on Sports in Less Than 60 Days* (July 10, 2023), kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=1859.



92FB4D40-862E-4579-900B-6D10A3229023 : 000007 of 000056

28. To carry out its mandate, the KHRGC has established extensive regulations governing sports wagering and its duly licensed operators and their affiliates, and it has been granted “all powers necessary and proper” to carry out and enforce those regulations by investigating possible infractions, holding administrative hearings, and issuing disciplinary action and penalties to licensees. *See, e.g.,* KRS 230.260(16) (requiring the KHRGC to establish standards for the conduct of sports wagering); KRS 230.361 (requiring the KHRGC to promulgate administrative regulations to establish the Commonwealth’s sports wagering system); KRS 230.811(1) (authorizing licensed service providers to conduct sports wagering in Kentucky); 809 KAR 10:008 (identifying grounds for disciplinary action).

29. The Commonwealth, including the KHRGC, has demonstrated a strong commitment to protecting its citizens who engage in sports wagering through licensing requirements, regulations to ensure wagering integrity, and safeguards for problem gamblers.

**1. Licensing requirements for sports wagering in Kentucky.**

30. Sports wagering operating licenses are only available to Kentucky’s licensed horse racing associations. KRS 230.811(2); *see* KRS 230.260 *et seq.* (setting out KHRGC’s licensure requirements and approval processes for horse racing associations and participants, and pari-mutuel wagering on horse racing).

31. Horse racing associations licensed as sports wagering operators are permitted to contract with up to three licensed service providers, *see* KRS 230.805(4), to “conduct or manage sports wagering through an agreement with a track and provide these services at a licensed facility for sports wagering, simulcast facility, or through a website or mobile interface approved by the corporation,” KRS 230.210(34).



92FB4D40-862E-4579-900B-6D10A3229023 : 000008 of 000056

32. When approving a service provider's licensing application, the KHRGC must consider several factors to determine whether "participation as a sports wagering service provider is in the best interests of sports wagering in Kentucky." 809 KAR 1:002. To obtain a license, sports wagering service providers must demonstrate, among other things, that they have the skill, experience, knowledge, and ability necessary to operate as a service provider. 809 KAR 1:002, Section 4(4).

33. Further, most employees of sports wagering operators and service providers are required to obtain a license from the KHRGC. KRS 230.310(2). This includes customer service representatives, ticket writers, supervisors, money-handlers, and anyone else that has the capacity to affect the outcome of sports wagering by manipulating coding relating to wagering systems. *See* 809 KAR 1:003, Section 6. Information services providers supporting sports wagering licensees are also required to be licensed by the KHRGC.

34. After a criminal, financial, and personal background check, the KHRGC can "issue [an occupational] license if it finds that the financial responsibility, age, experience, reputation, competence, and general fitness of the applicant to perform the activity permitted by a license are consistent with the best interest of sports wagering in the Commonwealth, and the maintenance of the honesty, integrity, and high quality thereof." KRS 230.310(2)(c); *see* 809 KAR 1:003.

35. KHRGC enforces broad audit and control regulations for licensees, including:

a. Internal controls for accounting and security procedures;

b. Financial and statistical reporting requirements;

c. Employee data and organizational charts;

d. Sufficient infrastructure and security programs to ensure compliance with industry standards for event wagering procedures;

e. Annual audits by a qualified and independent entity. 809 KAR 10:006.



92FB4D40-862E-4579-900B-6D10A3229023 : 000009 of 000056

36. Only operators licensed by the KHRGC can offer sports wagering in the Commonwealth of Kentucky. KRS 230.811(1). All other "[s]ports wagering shall not be offered in this state." KRS 230.805(2).

**2. Standards for wagering, audits, and controls.**

37. The KHRGC has implemented standards for sports wagering, including the publication of "comprehensive wagering rules," approved method of wagering for pools and tournaments, payment terms and methods, and more. 809 KAR 10:002.

38. The KHRGC prohibits wagers for certain types of sporting events (e.g. amateur and other unsanctioned events) and incidents (e.g. injuries, penalties, and officiating decisions). 809 KAR 10:002, Section 3. Sporting event participants—including athletes, coaches, umpires, and team owners—are also prohibited from placing wagers on events in which they are involved. KRS 230.820.

39. Sporting event governing bodies can notify the KHRGC if they have good cause to believe that the integrity of an event being wagered on by Kentuckians has been compromised. 809 KAR 10:002, Section 3.

**3. Kentucky's commitment to responsible gaming and advertising.**

40. The KHRGC maintains a "self-exclusion" list whereby problem and compulsive gamblers can confidentially add their name and information to be blocked from gambling in any properly licensed wagering location within the Commonwealth. Each licensee must have a policy specifying how it will identify and exclude these individuals; the policy must be submitted to and approved by the KHRGC. 809 KAR 10:007, Section 1.

41. Each wagering establishment is also required to develop and maintain a "responsible gaming program" that helps publicize the self-exclusion program and other resources



92FB4D40-862E-4579-900B-6D10A3229023 : 000010 of 000056

for problem and compulsive gamblers. 809 KAR 10:007, Section 2. Beyond self-exclusion, the Commonwealth has allocated 2.5% of its sports wagering tax revenue to fund the Problem Gambling Assistance Fund, designed to fund support programs and educational initiatives on problem gambling and prevention. 908 KAR 2:300.

42. The KHRGC also restricts marketing and advertising by licensed wagering operations to ensure all representations are accurate and not targeted at any elementary, middle, or high school activities. 809 KAR 10:007, Section 3.

43. Legislators are continuing to push for additional bettor protections. Recently, the Kentucky legislature enacted House Bill 904, which raises the age limit for legal gambling from 18 to 21 and bans certain "proposition wagers" on college athletes playing for Kentucky schools, among other protections.

**4. Revenues from authorized sports wagering.**

44. From the outset, Kentucky public officials emphasized, in supporting the limited legalization of online sports wagering, the revenue that such wagering would create for the Commonwealth, with the "funds staying right here in our state to help us build a better

92FB4D40-862E-4579-900B-6D10A3229023 : 000011 of 000056

Kentucky."[5] Kentucky imposed excise taxes of 9.75% on adjusted gross revenues from in-person wagers at licensed facilities and a 14.25% tax on online wagers made within the Commonwealth.[6]

45. The Commonwealth initially anticipated sports wagering would create an estimated $23 million in annual revenue for the Commonwealth, with a portion dedicated to the Kentucky permanent pension fund and 2.5% to the problem gambling assistance account.[7]

46. Kentucky's tax revenue has far exceeded these initial estimates, bringing in almost four times the projected revenue in the first two years. In the first 15 months of sports betting, the Commonwealth collected almost $55 million in revenue.[8] By December 2025, the Commonwealth had collected nearly $105 million in tax revenue from sports wagering in the 27 months since being legalized.[9]

47. Just over 2 years after sports wagering became legalized, tax revenue from sports wagering accounted for 0.55% of Kentucky's total quarterly tax revenue.[10]

48. Defendants' unlicensed online sports wagering deprives the Commonwealth of significant sports wagering tax revenue.

---

[5] *See* Office of the Governor, *Gov. Beshear Places Kentucky's First Sports Wager at Iconic Churchill Downs* (Sept. 7, 2023), https://www.kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=1930.

[6] *Sports betting tax revenue surges 382% as states expand legal markets*, WKYT (Dec. 10, 2025, 1:32 PM), https://www.wkyt.com/2025/12/10/sports-betting-tax-revenue-surges-382-states-expand-legal-markets/.

[7] *Id*.

[8] *Kentucky Sports Betting Handle Hits New Record in January*, THE IGAMING POST ONLINE NEWSPAPER (Mar. 4, 2025), https://gaming-awards.com/NEWS/kentucky-sports-betting-handle-hits-new-record-in-january/.

[9] Eric Ramsey, *US Sports Betting Revenue & Handle,* LEGAL SPORTS REPORT (Mar. 27, 2026), https://www.legalsportsreport.com/sports-betting-states/revenue/.

[10] *Sports betting tax revenue surges 382% as states expand legal markets*, WKYT (Dec. 10, 2025, 1:32 PM), https://www.wkyt.com/2025/12/10/sports-betting-tax-revenue-surges-382-states-expand-legal-markets/.



92FB4D40-862E-4579-900B-6D10A3229023 : 000012 of 000056

### B. Defendants Offer Unlicensed Sports Wagering in Kentucky Through Their Prediction Market Platforms.

92FB4D40-862E-4579-900B-6D10A3229023 : 000013 of 000056

49. Defendants are not licensed Kentucky sports wagering operators.

50. Because none of the Defendants are licensed horse racing associations, they are ineligible to become licensed sports wagering operators in Kentucky. See KRS 230.811(2) ("As a prerequisite to obtaining a sports wagering license, a person shall be licensed as an association under KRS 230.300."); KRS 230.300 (setting out licensure requirements for horse racing associations).

51. Defendants are also not licensed sports wagering service providers in Kentucky.[11]

52. House Bill 904 prohibits licensed sports wagering operators from contracting with Defendants for Defendants to serve as sports wagering service providers.

53. Yet, despite being unlicensed to offer sports wagering in Kentucky, Defendants do exactly that.

#### 1. Defendants offer and profit from prediction market platforms in Kentucky.

54. Through their websites and mobile applications, Defendants operate what they refer to as "prediction markets," through which they encourage, facilitate, and allow Kentucky

[11] *See* Kentucky Horse Racing and Gaming Corporation Licensed Service Providers & Partnering Track/Operators, https://khrc.ky.gov/Search/Partnerships.aspx.

consumers to place bets on the outcomes of a wide variety of events, including on the outcome of sporting events. Defendants refer to the wagers placed on their platform as “event contracts.”

55. Kalshi charges a fee tied to the expected earnings on an individual contract.[12] Kalshi’s transaction fee is dynamic and variable, and is determined by whether a bet is made against lopsided odds (either for or against) or towards more evenly distributed odds.[13]




56. In 2025, 89% of Kalshi’s fees came from sports wagering.[14]

57. Because Kalshi’s trading fees are calculated as a percentage of each contract, it has a community of interest in the stakes of each completed transaction, and is therefore a “winner” alongside its winning customers.[15]

---

[12] *Kalshi Trading Fees*, KALSHI, https://kalshi.com/docs/kalshi-fee-schedule.pdf

[13] Kalshi Fee Schedule, KALSHI, https://kalshi.com/docs/kalshi-fee-schedule.pdf

[14] Daniel O’Boyle, *Kalshi Fee Revenue in 2025 was $263.5 Million, With 89% Coming from Sports*, INGAME, https://www.ingame.com/kalshi-fee-revenue-2025.

[15] *Kalshi Fee Schedule*, KALSHI, https://kalshi.com/docs/kalshi-fee-schedule.pdf.



92FB4D40-862E-4579-900B-6D10A3229023 : 000014 of 000056

58. Kalshi's financial stake extends beyond the transaction fees charged. Because Kalshi matches bettors on opposite sides of a particular wager, to ensure a sufficient volume of betting activity on both sides of a bet, Kalshi uses so-called "market makers," including its own affiliated entity, Kalshi Trading LLC ("Kalshi Trading"), to place bets.

59. Kalshi Trading supplies liquidity by placing both buy and sell orders for event contracts to ensure that bettors can wager at nearly all times. It takes opposing positions, absorbs imbalances in bettor demand, and profits from price movements. For example, suppose Kalshi offers a contract asking, "Will the New York Yankees win their game on Tuesday?" A bettor might want to wager on 100 "Yes" shares at 65 cents each, expecting the Yankees to win. But if there are not enough other bettors willing to sell "No" shares at that price, Kalshi Trading steps in and buys the "No" shares so the customer can purchase the 100 contracts as desired.

60. Individual Kalshi users never know whether they are betting against other bettors or against a market maker like Kalshi Trading. In this way, Kalshi plays a role similar to that of the house in a traditional gambling model.

61. Kalshi also has an affiliated clearinghouse under common ownership called Kalshi Klear LLC that finalizes and settles event contract wagers. Kalshi Klear is responsible for determining outcomes, issuing payouts, and processing the movement of funds between bettors once an event is resolved. It functions entirely within Kalshi's corporate structure, not as an outside intermediary. Kalshi controls each stage of the wager, from the contract, settlement, and payment processing.

62. Kalshi is not merely providing a platform for third-party trading. Instead, it is a closed-loop wagering system, where Kalshi creates the games, handles the bets, and pays out the winners as a typical bookmaker would do.



92FB4D40-862E-4579-900B-6D10A3229023 : 000015 of 000056

63. In February 2025, Webull partnered with Kalshi to enter the predictions market space through a prediction markets hub on the Webull website and mobile applications.[16] This partnership allows Webull users to buy and sell Kalshi's event contracts using the Webull platform. Because those event contracts are sourced by Kalshi, the offerings are practically identical to the ones that Kalshi provides on its own website, including the ability to wager on the outcome of sporting events. Webull and Kalshi each receive a fee whenever an event contract is purchased on Webull's prediction markets hub.

64. Similarly, in March 2025, Robinhood partnered with Kalshi to launch its own prediction markets hub.[17] This hub effectively allows Robinhood users to buy and sell Kalshi event contracts without ever having to leave Robinhood's platform. Because Robinhood's event contracts are sourced by Kalshi, its prediction markets hub is practically identical to the prediction platform that Kalshi offers on its own website, including the ability to wager on the outcome of sporting events. Robinhood and Kalshi each receive a fee whenever an event contract is purchased on Robinhood prediction markets hub.

65. In December 2025, Coinbase partnered with Kalshi to launch its own prediction markets hub.[18] This hub effectively allows Coinbase users to buy and sell Kalshi event contracts

---

[16] *See* Hanna Erin Lang, *Investing Platform Webull Launches Event Contracts*, THE WALL STREET JOURNAL (Feb. 12, 2025, 6:31 PM), https://www.wsj.com/livecoverage/cpi-report-today-inflation-stock-market-02-12-2025/card/investing-platform-webull-launches-event-contracts-7a8HLGTFHg0YQxqXsFZe?gaa_at=eafs&gaa_n=AWEtsqeBJEzHRKwZRnN7pYSjdonmcQUnx2RqsHRqkSF86f_OYJzhiSUAnB4L1r2o7js%3D&gaa_ts=69ce8aa3&gaa_sig=rIGGgVqcRFzygp9sTEBZrBaw2wSOMdtaG__H4EP5F3k6D3fCLY4k8OkaDBcNCOZXPQooz-HtvFc0OJtbfOV0KA%3D%3D.

[17] *See* Brady Dale, *Robinhood rolls out prediction markets with sports contracts*, AXIOS (Mar. 17, 2025), https://www.axios.com/2025/03/17/robinhood-prediction-markets-kalshi-sports.

[18] *See* Ian Allison*, Coinbase rolls out stock trading, prediction markets and more in bid to become 'Everything Exchange*,' CoinDesk (Dec. 17, 2025), https://www.coindesk.com/business/2025/12/17/coinbase-rolls-out-stock-trading-prediction-markets-and-more-in-bid-to-become-the-everything-exchange.



92FB4D40-862E-4579-900B-6D10A3229023 : 000016 of 000056

without ever having to leave Coinbase's platform. Because Coinbase's event contracts are sourced by Kalshi, its prediction markets hub is practically identical to the prediction platform that Kalshi offers on its own website, including the ability to wager on the outcome of sporting events. Coinbase and Kalshi each receive a fee whenever an event contract is purchased on Coinbase prediction markets hub.

**2. Defendants' sports "event contracts" are wagers.**

66. "Event contracts" are investment instruments that ensure payment to a contract holder if a particular event happens, and they have existed in the United States since the nineteenth century.[19] These contracts were originally developed by commodity traders as a straightforward way of hedging their investments in raw materials, like timber and grain. By purchasing an event contract for an adverse event, like a flood or fire during the harvest season, commodity traders could offset the losses from that year's poor yield.

67. Defendants, however, have repurposed the event contract to allow consumers to wager on the outcomes of a wide range of real-world and imminent (or already ongoing) events, such as which actor will win an Oscar[20] or which phrase Sean Hannity will say during his next show.[21]

[19] Peter Gratton, *Event Contracts: What They Are and How They Are Used*, INVESTOPEDIA (Mar. 18, 2025), https://www.investopedia.com/events-contracts-8601422.

[20] *See Oscar for Best Actor?*, KALSHI, https://kalshi.com/markets/kxoscaracto/oscar-for-best-actor/kxoscaracto-26.

[21] *See What will Sean Hannity say during his show?*, KALSHI, https://kalshi.com/markets/kxmention/what-will-someone-say/kxmention-hann26mar11.



92FB4D40-862E-4579-900B-6D10A3229023 : 000017 of 000056







68. Defendants' platforms offer recurring daily contests, such as what will top Spotify's "Weekly Top Songs USA" list tomorrow,[22] and what the highest temperature will be in New York City today.[23]

69. Event contracts are structured as binary options: bettors buy "Yes" or "No" positions on whether an event will occur ("Yes") or will not occur ("No"). This probability is expressed as a percentage, ranging from 0% (certain to not happen) to 100% (certain to happen). This percentage corresponds to a monetary value, as the combined investment of "Yes" and "No" users must equal $1.00.[24]

70. As more people purchase the "Yes" option in an event contract, the perceived likelihood of that outcome increases and the "Yes" contract price also increases. Conversely, if more people purchase the "No" option, the contract price of the "No" contracts would increase.

[22] *See Top Song on Weekly Top Songs USA on Mar 12, 2026?*, KALSHI, https://kalshi.com/markets/kxspotifyw/weekly-us-spotify-chart/kxspotifyw-26mar12 (last visited Apr. 2, 2026).

[23] *See Highest temperature in NYC on Mar 11, 2026*?, KALSHI, https://kalshi.com/markets/kxhighny/highest-temperature-in-nyc/kxhighny-26mar11 (last visited Apr. 2, 2026).

[24] *How are prices determined?*, KALSHI, https://help.kalshi.com/en/articles/13823836-how-are-prices-determined.



92FB4D40-862E-4579-900B-6D10A3229023 : 000018 of 000056

71. Defendants' models reflect less risk (and less profit) to the contract holder for outcomes perceived to be more likely, and more risk (but more profit) to contract holders who thought the outcome was less likely to occur.

72. All Defendants' models operate in the same manner.

73. In January 2025, Kalshi began to offer sports wagering contracts. In a short period of time, the vast majority of events "invested" in on Kalshi became various sporting event outcomes—ranging from the final result of the game, including the final spread of points and the actions of individual players during the game.

74. From January to June of 2025—approximately the first five months Kalshi offered sports event contracts—bettors wagered more than $1 billion on 3.4 million sports wagers.

75. Sports event wagers comprised approximately 70% of Kalshi's trading volume between February 25, 2025, and May 17, 2025. Kalshi made more from sports wagers than licensed sports wagering platforms DraftKings or FanDuel over the course of the same February through May timeframe.

76. And by July 2025, Kalshi announced that it "crossed $2 billion in sports trading volume" in the preceding 6 months, since it launched its first sports market.[25] For calendar year 2025, Kalshi had $22.88 billion in volume, 89% of which was sports wagering. Kalshi made $263.5 million in fee revenue in 2025, with $234.6 million of that coming from sports wagering.[26]

77. Robinhood, Webull, and Coinbase—through their partnerships with Kalshi—have also facilitated significant sports betting on their prediction market hubs.

---

[25] See, Kalshi Instagram post (July 16, 2025), *available at:* https://www.instagram.com/reel/DMLqEM6yk_q/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==.

[26] Daniel O'Boyle, *Kalshi Fee Revenue in 2025 was $263.5 Million, With 89% Coming from Sports*, INGAME, https://www.ingame.com/kalshi-fee-revenue-2025/.



92FB4D40-862E-4579-900B-6D10A3229023 : 000019 of 000056

78. During its fourth quarter earnings call, Robinhood announced that users traded over 12 billion contracts in 2025, which contributed to a business run rate above $300 million.[27]

79. Webull announced that 152 million contracts were traded on its platform during the fourth quarter of 2025.[28]

80. Defendants employ a variety of classic sports-betting devices, including moneylines, spreads, point totals, parlays, and prop bets. These offerings do not exist independent of the sports betting industry and relate to nothing except ways to gamble on sports.

81. As exemplified by Kalshi's website,[29] Defendants each employ sports-betting devices relating to the outcome of a sporting event: moneylines, spreads, and totals.

92FB4D40-862E-4579-900B-6D10A3229023 : 000020 of 000056

---

[27] Motley Fool Transcribing, *Robinhood (HOOD) Q4 Earnings Call Transcript*, THE MOTLEY FOOL (Feb. 10, 2026, 6:44 PM), https://www.fool.com/earnings/call-transcripts/2026/02/10/robinhood-hood-q4-2025-earnings-call-transcript/.

[28] Maham Fatima, *Webull (BULL) Reports 2025 Revenue of $571M, 46% YoY Growth*, YAHOO! FINANCE (Mar. 6, 2026), https://finance.yahoo.com/news/webull-bull-reports-2025-revenue-200036444.html.

[29] KALSHI, *Sacramento at Golden State*, https://kalshi.com/markets/kxnbagame/professional-basketball-game/kxnbagame-26apr07sacgsw?op_market_ticker=KXNBAGAME-26APR07SACGSW-GSW.




92FB4D40-862E-4579-900B-6D10A3229023 : 000021 of 000056

82. As exemplified by Robinhood's website, each Defendant also offers in-game wagering where users can place bets on the outcome of sporting events while they are in progress.




83. A wager on the outcome of a sporting event is not a "swap" as defined in 7 U.S.C.A. § 1a(47)(A)(ii).

84. Defendants Kalshi and Robinhood also offer parlays on their platforms.

85. Parlays are a common and popular type of sports gambling wager that allow the bettor to combine multiple bets (or "legs") into one. If all of their selections win, the bettor will receive a larger payout than if they had bet on a single event.

86. Despite the longer odds of winning and the more complicated calculation for odds of success, a recent Washington Post article on sports betting makes clear that, quite simply,



92FB4D40-862E-4579-900B-6D10A3229023 : 000022 of 000056

"America is obsessed with parlays."[30] Indeed, more than 70% of NFL and NBA bets on FanDuel came from parlays in 2023, according to FanDuel parent company Flutter Entertainment.

87. To capitalize on the popularity of sports parlays, Kalshi and Robinhood, as demonstrated through the screenshot below from Robinhood's app, offer "combos" that "allow users to trade custom combinations of events."[31] While the combos come with higher payouts if all outcomes are correct, the bettor loses everything if any outcome is wrong. When launched, industry experts swiftly equated Defendants' combos with sportsbook parlays.[32]




---

[30] Emily Giambalvo, Kati Perry, and Aaron Steckelberg, *Americans Can't Stop Betting Parlays. Sportsbooks are Cashing In*, THE WASHINGTON POST (October 9, 2025), *https://www.washingtonpost.com/sports/interactive/2025/parlay-popularity-odds-sportsbooks/?itid=sr_0_73aac7bf-f36c-4046-9eec-663be16f2d43*.

[31] *See Combos*, KALSHI, https://help.kalshi.com/en/articles/13823820-combos.

[32] *See* Ryan Butler, *Kalshi's Combo Event Contracts Raise Prediction Market Stakes*, YAHOO! FINANCE (Dec. 16, 2025), *https://finance.yahoo.com/news/kalshis-combo-event-contracts-raise-212400945.html*.



92FB4D40-862E-4579-900B-6D10A3229023 : 000023 of 000056

88. A wager on the outcome of a parlay is not a "swap" as defined in 7 U.S.C.A. § 1a(47)(A)(ii).

89. Defendants, as exemplified by the following from the Kalshi website, also each offer proposition bets, which are wagers placed on specific occurrences within a game, such as individual player statistics, not just the final score or outcome.




90. A wager on the outcome of a proposition bet is not a "swap" as defined in 7 U.S.C.A. § 1a(47)(A)(ii).

91. Each Defendant has caused gamblers in Kentucky to lose more than five dollars during a twenty-four hour period on their various sports wagers.



92FB4D40-862E-4579-900B-6D10A3229023 : 000024 of 000056

92. The sporting "event contracts" that Defendants offer have no value as a hedging instrument and are not intended to be hedging instruments, except insofar as a user is hedging potential sports gambling losses.

93. Indeed, Kalshi conceded, in a 2024 legal brief, that an event contract "contingent on a game or a game-related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament" constituted a contract involving "gaming" (read: gambling).[33] It went on to acknowledge that such sports betting was "unlikely to serve *any* 'commercial or hedging interest.'"[34]

94. Yet, despite attempting to distance itself from online gambling when legally convenient, Kalshi has separately acknowledged that it is in direct competition with online sportsbooks like DraftKings and FanDuel, and promoted its business as a "disrupter" of online sportsbooks' businesses.[35]

95. Further, Kalshi has run ads explicitly calling sports event contracts purchased on their platforms "bets" and stating that its platform offer a "legal" way to "bet" on sports in all 50 states.[36]

---

[33] Brief of Petition KalshiEx LLC at 17, *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205).

[34] *Id*. at 45 (emphasis added).

[35] CNBC Television, *Kalshi CEO Tarek Mansour on NHL partnership: A seminal moment for prediction markets*, YOUTUBE (Oct. 22, 2025), https://www.youtube.com/watch?v=fKzu5mEEfAg.

[36] Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal In California, Texas*, EVENT HORIZON (Sept. 17, 2025), https://nexteventhorizon.substack.com/p/kalshi-is-advertising-sports-betting-legal-in-california-texas.



92FB4D40-862E-4579-900B-6D10A3229023 : 000025 of 000056

### 3. Defendants' sporting event contracts constitute sports wagering under Kentucky law.

96. Defendants' sporting event contracts constitute "sports wagering" under Kentucky law because they engage in "wagering on…sporting events or portions of sporting events, or on the individual performance statistics of athletes in a sporting event or combination of sporting events…." KRS 230.210(32).

97. Defendants' offerings meet the definition of a "wager" under Kentucky law because their users risk a sum of money (i.e. the price of the contract) on a sporting event for which the outcome is uncertain (i.e. the position taken on the event contract). 809 KAR 10:001, Section 1 (66). Defendants' patrons who win their wagers receive "winnings" paid to them as a direct result of a successful sports wager. 809 KAR 10:001, Section 1(69).

98. Further, Kentucky law defines "type of wager" as the form of a wager offered by a sports wagering operator, including single game bets, parlays, money line bets, in-play bets, and more. 809 KAR 10:001, Section 1 (62). Defendants offer these types of wagers.

99. Accordingly, Defendants' sports events contracts are wagers on uncertain sporting event outcomes, structured and operated in a manner that meets the legal definition of sports wagering under Kentucky law.

## C. Through Their Platforms and Advertising, Defendants Deceptively Misrepresent That They Offer Legal and Authorized Sports Wagering.

100. Defendants market to Kentuckians through their websites, mobile apps, advertisements on streaming videos and television (especially during or surrounding sports broadcasts), and through social media platforms.

101. Defendants' advertisements convey the false and misleading impression that they are authorized to offer sports wagering under Kentucky law.



92FB4D40-862E-4579-900B-6D10A3229023 : 000026 of 000056

102. Kalshi has regular and sports-focused social media accounts that are available to Kentucky residents, including Instagram (@kalshi and @kalshisports), TikTok (@kalshi_markets), and X (@kalshi). Kalshi advertised across these platforms, including to Kentuckians, that Kalshi's customers can "bet" on a variety of events. For example, on mobile application stores such as the "App Store" for iOS (Apple) devices and "Google Play" for Android devices, Kalshi's taglines have included: "You can bet on that"[37] and "Legal in all 50 states."[38]




[37] Appshot.Gallery is a company that describes itself as a resource for developers and designers trying to optimize mobile application store listings. The website's gallery of curated screenshots includes these from Kalshi. *See* APPSHOT.GALLERY, https://www.appshot.gallery/app/kalshi-bet-on-the-headlines (last visited Apr. 2, 2026).

[38] *See, id*.



92FB4D40-862E-4579-900B-6D10A3229023 : 000027 of 000056

103. When Kalshi opened its platform to sports wagering in January 2025,[39] Kalshi's announcement read, "Game on: Kalshi brings 100% legal sports trading to all 50 states."[40]




[39] Stuart Dyos, *Prediction market Kalshi enters sports betting ahead of Super Bowl, days after naming Donald Trump Jr. as an advisor,* FORTUNE (Jan. 25, 2025), *https://fortune.com/2025/01/25/kalshi-sports-betting-donald-trump-jr-super-bowl-prediction-market/?utm_source=search&utm_medium=suggested_search&utm_campaign=search_link_clicks*

[40] Terry Oldreal, *Game on: Kalshi brings 100% legal sports trading to all 50 states,* KALSHI (Jan. 24, 2025), *available at: https://news.kalshi.com/p/game-on-kalshi-sports-trading-is-now-100-legal-in-all-50-states-2*.



92FB4D40-862E-4579-900B-6D10A3229023 : 000028 of 000056

104. Through Instagram, Kalshi has proclaimed that it is "The First Nationwide Legal Sports Betting Platform,"[41] evidencing Kalshi's strategy to operate and market like a gambling entity rather than a risk management platform. It also has other social media posts using the terms "odds"[42] and chances,[43] which are associated with traditional gambling.







[41] Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, EVENT HORIZON (Apr. 3, 2025), *available at:* https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could.

[42] Kalshi Instagram post from May 13, 2025, *available at: https://www.instagram.com/p/DJm5EaTPpYA/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==*

[43] Kalshi Instagram post from May 13, 2025, *https://www.instagram.com/p/DKU5SUPgtP4/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==*.



92FB4D40-862E-4579-900B-6D10A3229023 : 000029 of 000056

105. Further, Defendants all promote sports gambling to Kentuckians on their websites, as exemplified below and on the following page:







92FB4D40-862E-4579-900B-6D10A3229023 : 000030 of 000056







106. Defendants have not disclosed, through their websites or advertisements, that they are not authorized to accept sports wagers under Kentucky law.

**D. Defendants' Platforms Lack Safeguards for Responsible Gambling Required by Kentucky Law.**

107. Gambling has serious public health risks that may lead to harm to a gambler's financial, economic, emotional, and physical well-being, as well as the well-being of their families and communities.

108. Studies conducted by the National Council on Problem Gambling show that "[t]he rate of gambling problems among sports bettors is at least twice as high as among gamblers in



92FB4D40-862E-4579-900B-6D10A3229023 : 000031 of 000056

general. . . . [and] the rate of problems is even higher" when sports wagering takes place online, "with one study of online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems."[44]

109. Kentucky's Department for Behavioral Health, Developmental and Intellectual Disabilities offers a program for Kentuckians about safe gambling practices, the risks posed by gambling, and services to reduce the consequences of problem gambling.[45]

110. The Commonwealth has also allocated 2.5% of its sports wagering tax revenue to fund the Problem Gambling Assistance Fund, designed to fund support programs and educational initiatives on problem gambling and prevention. 908 KAR 2:300.

111. Kentucky law requires sports wagering operators to post a toll-free help number (1-800-GAMBLER) in a conspicuous place on its website and apps, offer educational content on the risks of problem gambling, warn users that underage gambling is a criminal offense, and honor self-exclusion requests from patrons seeking to block their own access to the wagering platform. 809 KAR 10:007. With respect to the self-exclusion requests, the KHRGC compiles a list of individuals asking to be blocked from future gambling activities and shares it with all licensed sports wagering operators in the Commonwealth. Individuals on the self-exclusion list are prohibited from entering a race track and participating in any gambling activity. 801 KAR 2:100.

112. Defendants' licensed competitors are required to comply with these rules and are subject to the continued oversight of the KHRGC. For example, licensed Kentucky operator Red

---

[44] A Review of Sports Wagering & Gambling Addiction Studies Executive Summary, NAT'L COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/wp-content/uploads/2023/09/Sports-gambling_NCPGLitRvwExecSummary.pdf

[45] *See Problem Gambling Program*, KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES, *https://www.chfs.ky.gov/agencies/dbhdid/Pages/Problem-Gambling-Program.aspx*.



92FB4D40-862E-4579-900B-6D10A3229023 : 000032 of 000056

Mile Gaming & Racing and its sports wagering service provider, Caesar's, posts the toll-free help line in several places on its websites, identifies factors that suggest someone may be experiencing problem gambling, and offers a self-exclusion policy as required by 810 KAR 2:100:[46]

113. Similarly, other sports wagering platforms doing business in Kentucky offer users significant resources to learn about and address problem gambling. For example, FanDuel provides its customers with:

a. Tools to monitor their spending activity and trends, and place limits on their deposits, losses, wagers, wager size, and time spent on the website.

b. The 1-800-GAMBLER phone number and contact information for the Kentucky Council on Problem Gambling;

c. A self-exclusion list to block their access to FanDuel's website, both for shorter and longer time periods;

d. Links to several problem gambling support groups and tools, such as Gamblers Anonymous and BetBlocker, a free and anonymous application that allows gamblers to fully restrict or limit their access to thousands of gambling websites;

e. Access to several resources, such as online web courses on responsible gaming and materials to help educate youth about gambling and its risks,

f. Free counseling services "to help manage your transition away from gambling" through its partnership with Kindbridge.

114. Likewise, DraftKings' Responsible Gaming Center offers a number of resources, including player-set betting and budget limits and alerts, temporary and long-term self-exclusion lists, player statistics, and more.

115. While Defendants offer sports wagering to anyone over the age of 18, after a simple sign-up process, Defendants provide few, if any, safeguards to educate users about financial responsibility or the risks of losing money.

[46] *See* RED MILE GAMING & RACING, *https://www.redmileky.com/resources*.



92FB4D40-862E-4579-900B-6D10A3229023 : 000033 of 000056

116. Kalshi only recently implemented minimal responsible gambling tools, such as offering deposit limits, trading breaks, and a self-exclusion list for a specific term of time. Instead of connecting users with the KHRGC-approved resources for addressing problem gambling, Kalshi offers its users "mental health support" through a partnership with Birches Health that can be covered by the user's own health insurance.[47]

117. Robinhood, Webull, and Coinbase fail to offer their customers any tools or resources to help identify or seek help for problem gambling. They do not offer a self-exclusion option or any other information on the risks posed by its prediction market as required by the KHRGC.

## V. CAUSES OF ACTION

### *CLAIMS ASSERTED AGAINST KALSHI*

### COUNT 1
### VIOLATIONS OF KENTUCKY CONSUMER PROTECTION ACT FOR FALSE, DECEPTIVE, AND MISLEADING ACTS AND PRACTICES (ASSERTED AGAINST KALSHI INC. AND KALSHIEX LLC)

118. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

119. The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170.

120. Defendants Kalshi Inc. and KalshiEX LLC (the "Defendants" for the purposes of this Count) have violated the KCPA by engaging in false, misleading, and/or deceptive acts or practices in the Commonwealth of Kentucky.

[47] *See Support and Resources for the Kalshi Community*, BIRCHES HEALTH, https://bircheshealth.com/kalshi (last visited Apr. 2, 2026).



92FB4D40-862E-4579-900B-6D10A3229023 : 000034 of 000056

121. Through the promotion of sports wagering on their website and mobile apps, Defendants have repeatedly conveyed the false, deceptive, and misleading impression that the sports wagers that they offer through their prediction market are lawful, and not void, in Kentucky.

122. Through their advertisements and social media accounts, Defendants have repeatedly conveyed the false, deceptive, and misleading impression that the sports wagers that they offer through their prediction market are lawful, and not void, in Kentucky.

123. At all times, Defendants' false, deceptive, and misleading conduct has been willful.

124. The Commonwealth is entitled to an injunction to prevent Defendants' continued violation of the KCPA. KRS 367.190.

125. For each of the Defendants' willful violations of KRS 367.170, the Commonwealth is entitled to recover a civil penalty of up to two thousand dollars ($2,000) per violation, and up to ten thousand dollars ($10,000) per violation when the conduct was directed at persons sixty (60) years or older. KRS 367.990

**COUNT 2**
**VIOLATIONS OF KENTUCKY CONSUMER PROTECTION ACT**
**FOR UNFAIR ACTS AND PRACTICES**
**(ASSERTED AGAINST KALSHI INC. AND KALSHIEX LLC)**

126. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

127. The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170.

128. Defendants Kalshi Inc. and KalshiEX LLC ("Defendants" for the purposes of this Count) have violated the KCPA by engaging in unfair acts and practices in the



92FB4D40-862E-4579-900B-6D10A3229023 : 000035 of 000056

Commonwealth of Kentucky through the unauthorized offering and facilitation of sports gambling within Kentucky.

129. Defendants' solicitation of sports wagers from people in Kentucky, in disregard for Kentucky's gambling laws, is unconscionable.

130. Through their unauthorized offering and facilitation of sports gambling within Kentucky, Defendants have caused substantial consumer injury in the form of monetary losses.

131. Defendants' unauthorized offering and facilitation of sports gambling within Kentucky is not outweighed by countervailing benefits to consumers or competition.

132. Defendants' unauthorized offering and facilitation of sports gambling within Kentucky is against public policy.

133. The Commonwealth is entitled to an injunction to prevent the Defendants' continued violation of the KCPA. KRS 367.190.

134. For each of the Defendants' willful violations of KRS 367.170, the Commonwealth is entitled to recover a civil penalty of up to two thousand dollars ($2,000) per violation, and up to ten thousand dollars ($10,000) per violation when the conduct was directed at persons sixty (60) years or older. KRS 367.990.

## COUNT 3
## VIOLATION OF KENTUCKY'S LOSS RECOVERY ACT
## (ASSERTED AGAINST KALSHI INC., KALSHIEX LLC, KALSHI KLEAR INC., KALSHI KLEAR LLC, AND KALSHI TRADING LLC)

135. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

136. Pursuant to KRS 372.010, unless authorized, "[e]very contract, conveyance, transfer or assurance for the consideration, in whole or in part, of money, property or other thing won, lost or bet in any game, sport, pastime or wager, or for the consideration of money, property



92FB4D40-862E-4579-900B-6D10A3229023 : 000036 of 000056

or other thing lent or advanced for the purpose of gaming, or lent or advanced at the time of any betting, gaming, or wagering to a person then actually engaged in betting, gaming, or wagering, is void."

137. Pursuant to KRS 372.010, each wager or contract on sporting event outcomes, including parlays and prop bets, by persons in Kentucky on the Kalshi, Robinhood, Webull, and Coinbase prediction market platforms, and each conveyance or transfer of money in connection therewith, is void.

138. Pursuant to KRS 372.020, "[i]f any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery."

139. Pursuant to KRS 372.040, if the loser in a gambling transaction does not sue for the money lost, pursuant to KRS 372.020, "within six (6) months after its payment or delivery to the winner" and "prosecute the suit to recovery with due diligence," another "person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment."

140. The Commonwealth is a "person" that may sue under KRS 372.040. *See Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792, 802 (Ky. 2020) ("Person includes the state unless the context of the statute requires otherwise. The context of the statute requires a determination that the Commonwealth of Kentucky has standing to bring this lawsuit.").



92FB4D40-862E-4579-900B-6D10A3229023 : 000037 of 000056

141. Kalshi Inc., KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC were each a "winner" with respect to all sports wagering on the Kalshi platform, including through the Robinhood, Webull, and Coinbase prediction market hubs, by persons in Kentucky because they received a percentage of, or fee on, each such wager. *See Stars Interactive*, 617 S.W.3d at 807 ("Our Court has interpreted winners to include individuals who take any portion of the amount lost since at least 1890.").

142. Kalshi Trading LLC was a "winner" with respect to wagers on sporting events on the Kalshi, Robinhood, Webull, and Coinbase platforms where it wagered and won against persons in Kentucky.

143. For all individual sports wagering losses of five dollars or more within a twenty-four hour period by persons wagering in Kentucky, and for which the loser did not sue for money lost and prosecute the suit to recovery with due diligence under KRS 372.040, the Commonwealth seeks from Defendants Kalshi Inc., KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, and Kalshi Trading LLC, and is entitled to receive, treble the value of the money lost.

**COUNT 4**
**VIOLATION OF KRS 528.100**
**(ASSERTED AGAINST KALSHI INC. AND KALSHIEX LLC)**

144. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

145. Pursuant to KRS 528.100(2), "any person who conducts, finances, manages, supervises, directs, or owns a gambling device intended for use in the Commonwealth in violation of [Chapter 528 of the Kentucky Penal Code] shall be subject to a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each device, payable to the county in which the device was operated."



92FB4D40-862E-4579-900B-6D10A3229023 : 000038 of 000056

146. Pursuant to KRS 528.100(3), the Attorney General "may cause an action in equity to be brought in the name of the Commonwealth . . . . [to] enjoin the operation of a gambling device in violation of this section."

147. A "gambling device" is defined, in relevant part, as "[a]ny electronic, computerized, or mechanical contrivance, terminal, machine, or other device that: (a) Requires the direct or indirect payment of consideration which may include and shall not be limited to the insertion of a coin, currency, ticket, token, or similar object, or by depositing funds with the operator or owner of the device, to operate, play, or activate a game; and (b) Offers games the outcomes of which are determined by any element of skill of the player and may deliver or entitle the person playing or operating the device to receive cash, cash equivalents, or gift cards or vouchers, billets, tickets, tokens, or electronic credits to be exchanged for cash or to receive merchandise or something of value, whether the payoff is made automatically from the device or manually." KRS 528.010.

148. The Kalshi website and mobile apps are gambling devices under KRS 528.010.

149. With the Kalshi website and mobile apps, Kalshi Inc. and KalshiEX LLC ("Defendants" for the purposes of this Count) conduct, finance, manage, supervise, direct, and own gambling devices intended for use in the Commonwealth in violation of Chapter 528 of the Kentucky Penal Code.

150. The Commonwealth seeks, and is entitled to, an order enjoining the operation of Defendants' gambling devices and a penalty of twenty-five thousand dollars ($25,000) for each device, payable to the county in which the device was operated.

92FB4D40-862E-4579-900B-6D10A3229023 : 000039 of 000056

### *CLAIMS ASSERTED AGAINST ROBINHOOD*

### COUNT 5
### VIOLATIONS OF KENTUCKY CONSUMER PROTECTION ACT FOR FALSE, DECEPTIVE, AND MISLEADING ACTS AND PRACTICES (ASSERTED AGAINST ROBINHOOD MARKETS, INC. AND ROBINHOOD DERIVATIVES LLC)

151. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

152. The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170.

153. Defendants Robinhood Markets, Inc. and Robinhood Derivatives LLC (the "Defendants" for the purposes of this Count) have violated the KCPA by engaging in false, misleading, and/or deceptive acts or practices in the Commonwealth of Kentucky.

154. Through the promotion of sports wagering on their website and mobile apps, Defendants have repeatedly conveyed the false, deceptive, and misleading impression that the sports wagers that they offer through their prediction market hub are lawful, and not void, in Kentucky.

155. At all times, Defendants' false, deceptive, and misleading conduct has been willful.

156. The Commonwealth is entitled to an injunction to prevent Defendants' continued violation of the KCPA. KRS 367.190

157. For each of the Defendants' willful violations of KRS 367.170, the Commonwealth is entitled to recover a civil penalty of up to two thousand dollars ($2,000) per violation, and up to ten thousand dollars ($10,000) per violation when the conduct was directed at persons sixty (60) years or older. KRS 367.990.



92FB4D40-862E-4579-900B-6D10A3229023 : 000040 of 000056

**COUNT 6**
**VIOLATIONS OF KENTUCKY CONSUMER PROTECTION ACT**
**FOR UNFAIR ACTS AND PRACTICES**
**(ASSERTED AGAINST ROBINHOOD MARKETS, INC. AND ROBINHOOD DERIVATIVES LLC)**

92FB4D40-862E-4579-900B-6D10A3229023 : 000041 of 000056

158. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

159. The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170.

160. Defendants Robinhood Markets, Inc. and Robinhood Derivatives LLC ("Defendants" for the purposes of this Count) have violated the KCPA by engaging in unfair acts and practices in the Commonwealth of Kentucky through the unauthorized offering and facilitation of sports gambling within Kentucky.

161. Defendants' solicitation of sports wagers from people in Kentucky, in disregard for Kentucky's gambling laws, is unconscionable.

162. Through their unauthorized offering and facilitation of sports gambling within Kentucky, Defendants have caused substantial consumer injury in the form of monetary losses.

163. Defendants' unauthorized offering and facilitation of sports gambling within Kentucky is not outweighed by countervailing benefits to consumers or competition.

164. Defendants' unauthorized offering and facilitation of sports gambling within Kentucky is against public policy.

165. The Commonwealth is entitled to an injunction to prevent the Defendants' continued violation of the KCPA. KRS 367.190.

166. For each of the Defendants' willful violations of KRS 367.170, the Commonwealth is entitled to recover a civil penalty of up to two thousand dollars ($2,000) per

violation, and up to ten thousand dollars ($10,000) per violation when the conduct was directed at persons sixty (60) years or older. KRS 367.990.

92FB4D40-862E-4579-900B-6D10A3229023 : 000042 of 000056

## COUNT 7
## VIOLATION OF KENTUCKY'S LOSS RECOVERY ACT
## (ASSERTED AGAINST ROBINHOOD MARKETS, INC. AND ROBINHOOD DERIVATIVES LLC)

167. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

168. Pursuant to KRS 372.010, unless authorized, "[e]very contract, conveyance, transfer or assurance for the consideration, in whole or in part, of money, property or other thing won, lost or bet in any game, sport, pastime or wager, or for the consideration of money, property or other thing lent or advanced for the purpose of gaming, or lent or advanced at the time of any betting, gaming, or wagering to a person then actually engaged in betting, gaming, or wagering, is void."

169. Pursuant to KRS 372.010, each wager or contract on sporting event outcomes, including parlays and prop bets, by persons in Kentucky on the Robinhood prediction market platform, and each conveyance or transfer of money in connection therewith, is void.

170. Pursuant to KRS 372.020, "[i]f any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery."

171. Pursuant to KRS 372.040, if the loser in a gambling transaction does not sue for the money lost, pursuant to KRS 372.020, "within six (6) months after its payment or delivery to the winner" and "prosecute the suit to recovery with due diligence," another "person may sue the

winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment."

172. The Commonwealth is a "person" that may sue under KRS 372.040. *See Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792, 802 (Ky. 2020) ("Person includes the state unless the context of the statute requires otherwise. The context of the statute requires a determination that the Commonwealth of Kentucky has standing to bring this lawsuit.").

173. Robinhood Markets, Inc. and Robinhood Derivatives LLC ("Defendants" for purposes of this Count) were each a "winner" with respect to all sports wagering on the Robinhood prediction market hub by persons in Kentucky because they received a percentage of, or fee, on each such wager. *See Stars Interactive*, 617 S.W.3d at 807 ("Our Court has interpreted winners to include individuals who take any portion of the amount lost since at least 1890.").

174. For all individual sports wagering losses of five dollars or more within a twenty-four hour period by persons wagering in Kentucky, and for which the loser did not sue for money lost and prosecute the suit to recovery with due diligence under KRS 372.040, the Commonwealth seeks from Defendants, and is entitled to receive, treble the value of the money lost.

## COUNT 8
## VIOLATION OF KRS 528.100
## (ASSERTED AGAINST ROBINHOOD MARKETS, INC. AND ROBINHOOD DERIVATIVES LLC)

175. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

176. Pursuant to KRS 528.100(2), "any person who conducts, finances, manages, supervises, directs, or owns a gambling device intended for use in the Commonwealth in violation



92FB4D40-862E-4579-900B-6D10A3229023 : 000043 of 000056

of [Chapter 528 of the Kentucky Penal Code] shall be subject to a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each device, payable to the county in which the device was operated."

177. Pursuant to KRS 528.100(3), the Attorney General "may cause an action in equity to be brought in the name of the Commonwealth . . . . [to] enjoin the operation of a gambling device in violation of this section."

178. A "gambling device" is defined, in relevant part, as "[a]ny electronic, computerized, or mechanical contrivance, terminal, machine, or other device that: (a) Requires the direct or indirect payment of consideration which may include and shall not be limited to the insertion of a coin, currency, ticket, token, or similar object, or by depositing funds with the operator or owner of the device, to operate, play, or activate a game; and (b) Offers games the outcomes of which are determined by any element of skill of the player and may deliver or entitle the person playing or operating the device to receive cash, cash equivalents, or gift cards or vouchers, billets, tickets, tokens, or electronic credits to be exchanged for cash or to receive merchandise or something of value, whether the payoff is made automatically from the device or manually." KRS 528.010.

179. The Robinhood website and mobile apps, through which Robinhood offers its prediction market hub, are gambling devices under KRS 528.010.

180. With the Robinhood website and mobile apps, Robinhood Markets, Inc. and Robinhood Derivatives LLC ("Defendants" for the purposes of this Count) conduct, finance, manage, supervise, direct, and own gambling devices intended for use in the Commonwealth in violation of Chapter 528 of the Kentucky Penal Code.

92FB4D40-862E-4579-900B-6D10A3229023 : 000044 of 000056

181. The Commonwealth seeks, and is entitled to, an order enjoining the operation of Defendants' gambling devices and a penalty of twenty-five thousand dollars ($25,000) for each device, payable to the county in which the device was operated.

92FB4D40-862E-4579-900B-6D10A3229023 : 000045 of 000056

## *CLAIMS ASSERTED AGAINST WEBULL*

### COUNT 9
### VIOLATIONS OF KENTUCKY CONSUMER PROTECTION ACT FOR FALSE, DECEPTIVE, AND MISLEADING ACTS AND PRACTICES (ASSERTED AGAINST WEBULL CORPORATION)

182. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

183. The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170.

184. Defendant Webull has violated the KCPA by engaging in false, misleading, and/or deceptive acts or practices in the Commonwealth of Kentucky.

185. Through the promotion of sports wagering on its website and mobile apps, Webull has repeatedly conveyed the false, deceptive, and misleading impression that the sports wagers that it offers through its prediction market hub are lawful, and not void, in Kentucky.

186. At all times, Webull's false, deceptive, and misleading conduct has been willful.

187. The Commonwealth is entitled to an injunction to prevent Webull's continued violation of the KCPA. KRS 367.190.

188. For each of Webull's willful violations of KRS 367.170, the Commonwealth is entitled to recover a civil penalty of up to two thousand dollars ($2,000) per violation, and up to ten thousand dollars ($10,000) per violation when the conduct was directed at persons sixty (60) years or older. KRS 367.990.

## COUNT 10
## VIOLATIONS OF KENTUCKY CONSUMER PROTECTION ACT FOR UNFAIR ACTS AND PRACTICES (ASSERTED AGAINST WEBULL CORPORATION)

189. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

190. The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170.

191. Webull has violated the KCPA by engaging in unfair acts and practices in the Commonwealth of Kentucky through the unauthorized offering and facilitation of sports gambling within Kentucky.

192. Webull's solicitation of sports wagers from people in Kentucky, in disregard for Kentucky's gambling laws, is unconscionable.

193. Through its unauthorized offering and facilitation of sports gambling within Kentucky, Webull has caused substantial consumer injury in the form of monetary losses.

194. Webull's unauthorized offering and facilitation of sports gambling within Kentucky is not outweighed by countervailing benefits to consumers or competition.

195. Webull's unauthorized offering and facilitation of sports gambling within Kentucky is against public policy.

196. The Commonwealth is entitled to an injunction to prevent Webull's continued violation of the KCPA. KRS 367.190.

197. For each of Webull's willful violations of KRS 367.170, the Commonwealth is entitled to recover a civil penalty of up to two thousand dollars ($2,000) per violation, and up to ten thousand dollars ($10,000) per violation when the conduct was directed at persons sixty (60) years or older. KRS 367.990.



92FB4D40-862E-4579-900B-6D10A3229023 : 000046 of 000056

**COUNT 11**
**VIOLATION OF KENTUCKY'S LOSS RECOVERY ACT**
**(ASSERTED AGAINST WEBULL CORPORATION)**

198. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

199. Pursuant to KRS 372.010, unless authorized, "[e]very contract, conveyance, transfer or assurance for the consideration, in whole or in part, of money, property or other thing won, lost or bet in any game, sport, pastime or wager, or for the consideration of money, property or other thing lent or advanced for the purpose of gaming, or lent or advanced at the time of any betting, gaming, or wagering to a person then actually engaged in betting, gaming, or wagering, is void."

200. Pursuant to KRS 372.010, each wager or contract on sporting event outcomes, including parlays and prop bets, by persons in Kentucky on the Webull prediction market platform, and each conveyance or transfer of money in connection therewith, is void.

201. Pursuant to KRS 372.020, "[i]f any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery."

202. Pursuant to KRS 372.040, if the loser in a gambling transaction does not sue for the money lost, pursuant to KRS 372.020, "within six (6) months after its payment or delivery to the winner" and "prosecute the suit to recovery with due diligence," another "person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment."



92FB4D40-862E-4579-900B-6D10A3229023 : 000047 of 000056

203. The Commonwealth is a "person" that may sue under KRS 372.040. *See Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792, 802 (Ky. 2020) ("Person includes the state unless the context of the statute requires otherwise. The context of the statute requires a determination that the Commonwealth of Kentucky has standing to bring this lawsuit.").

204. Webull was a "winner" with respect to all sports wagering on the Webull prediction market hub by persons in Kentucky because it received a percentage of, or fee on, each such wager. *See Stars Interactive*, 617 S.W.3d at 807 ("Our Court has interpreted winners to include individuals who take any portion of the amount lost since at least 1890.").

205. For all individual sports wagering losses of five dollars or more within a twenty-four hour period by persons wagering in Kentucky, and for which the loser did not sue for money lost and prosecute the suit to recovery with due diligence under KRS 372.040, the Commonwealth seeks from Webull, and is entitled to receive, treble the value of the money lost.

**COUNT 12**
**VIOLATION OF KRS 528.100**
**(ASSERTED AGAINST WEBULL CORPORATION)**

206. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

207. Pursuant to KRS 528.100(2), "any person who conducts, finances, manages, supervises, directs, or owns a gambling device intended for use in the Commonwealth in violation of [Chapter 528 of the Kentucky Penal Code] shall be subject to a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each device, payable to the county in which the device was operated."



92FB4D40-862E-4579-900B-6D10A3229023 : 000048 of 000056

208. Pursuant to KRS 528.100(3), the Attorney General "may cause an action in equity to be brought in the name of the Commonwealth . . . . [to] enjoin the operation of a gambling device in violation of this section."

209. A "gambling device" is defined, in relevant part, as "[a]ny electronic, computerized, or mechanical contrivance, terminal, machine, or other device that: (a) Requires the direct or indirect payment of consideration which may include and shall not be limited to the insertion of a coin, currency, ticket, token, or similar object, or by depositing funds with the operator or owner of the device, to operate, play, or activate a game; and (b) Offers games the outcomes of which are determined by any element of skill of the player and may deliver or entitle the person playing or operating the device to receive cash, cash equivalents, or gift cards or vouchers, billets, tickets, tokens, or electronic credits to be exchanged for cash or to receive merchandise or something of value, whether the payoff is made automatically from the device or manually." KRS 528.010.

210. The Webull website and mobile apps, through which Webull offers its prediction market hub, are gambling devices under KRS 528.010.

211. With the Webull website and mobile apps, Webull conducts, finances, manages, supervises, directs, and owns gambling devices intended for use in the Commonwealth in violation of Chapter 528 of the Kentucky Penal Code.

212. The Commonwealth seeks, and is entitled to, an order enjoining the operation of Webull's gambling devices and a penalty of twenty-five thousand dollars ($25,000) for each device, payable to the county in which the device was operated.



92FB4D40-862E-4579-900B-6D10A3229023 : 000049 of 000056

## *CLAIMS ASSERTED AGAINST COINBASE*

### COUNT 13
### VIOLATIONS OF KENTUCKY CONSUMER PROTECTION ACT FOR FALSE, DECEPTIVE, AND MISLEADING ACTS AND PRACTICES (ASSERTED AGAINST COINBASE FINANCIAL MARKETS. INC.)

213. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

214. The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170.

215. Defendant Coinbase has violated the KCPA by engaging in false, misleading, and/or deceptive acts or practices in the Commonwealth of Kentucky.

216. Through the promotion of sports wagering on its website and mobile apps, Coinbase has repeatedly conveyed the false, deceptive, and misleading impression that the sports wagers that it offers through its prediction market hub are lawful, and not void, in Kentucky.

217. At all times, Coinbase's false, deceptive, and misleading conduct has been willful.

218. The Commonwealth is entitled to an injunction to prevent Coinbase's continued violation of the KCPA. KRS 367.190.

219. For each of Coinbase's willful violations of KRS 367.170, the Commonwealth is entitled to recover a civil penalty of up to two thousand dollars ($2,000) per violation, and up to ten thousand dollars ($10,000) per violation when the conduct was directed at persons sixty (60) years or older. KRS 367.990.



92FB4D40-862E-4579-900B-6D10A3229023 : 000050 of 000056

**COUNT 14**
**VIOLATIONS OF KENTUCKY CONSUMER PROTECTION ACT**
**FOR UNFAIR ACTS AND PRACTICES**
**(ASSERTED AGAINST COINBASE FINANCIAL MARKETS, INC.)**

220. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

221. The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170.

222. Coinbase has violated the KCPA by engaging in unfair acts and practices in the Commonwealth of Kentucky through the unauthorized offering and facilitation of sports gambling within Kentucky.

223. Coinbase's solicitation of sports wagers from people in Kentucky, in disregard for Kentucky's gambling laws, is unconscionable.

224. Through its unauthorized offering and facilitation of sports gambling within Kentucky, Coinbase has caused substantial consumer injury in the form of monetary losses.

225. Coinbase's unauthorized offering and facilitation of sports gambling within Kentucky is not outweighed by countervailing benefits to consumers or competition.

226. Coinbase's unauthorized offering and facilitation of sports gambling within Kentucky is against public policy.

227. The Commonwealth is entitled to an injunction to prevent Coinbase's continued violation of the KCPA. KRS 367.190.

228. For each of Coinbase's willful violations of KRS 367.170, the Commonwealth is entitled to recover a civil penalty of up to two thousand dollars ($2,000) per violation, and up to ten thousand dollars ($10,000) per violation when the conduct was directed at persons sixty (60) years or older. KRS 367.990.



92FB4D40-862E-4579-900B-6D10A3229023 : 000051 of 000056

**COUNT 15**
**VIOLATION OF KENTUCKY'S LOSS RECOVERY ACT**
**(ASSERTED AGAINST COINBASE FINANCIAL MARKETS, INC.)**

92FB4D40-862E-4579-900B-6D10A3229023 : 000052 of 000056

229. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

230. Pursuant to KRS 372.010, unless authorized, "[e]very contract, conveyance, transfer or assurance for the consideration, in whole or in part, of money, property or other thing won, lost or bet in any game, sport, pastime or wager, or for the consideration of money, property or other thing lent or advanced for the purpose of gaming, or lent or advanced at the time of any betting, gaming, or wagering to a person then actually engaged in betting, gaming, or wagering, is void."

231. Pursuant to KRS 372.010, each wager or contract on sporting event outcomes, including parlays and prop bets, by persons in Kentucky on the Coinbase prediction market platform, and each conveyance or transfer of money in connection therewith, is void.

232. Pursuant to KRS 372.020, "[i]f any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery."

233. Pursuant to KRS 372.040, if the loser in a gambling transaction does not sue for the money lost, pursuant to KRS 372.020, "within six (6) months after its payment or delivery to the winner" and "prosecute the suit to recovery with due diligence," another "person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment."

234. The Commonwealth is a "person" that may sue under KRS 372.040. See Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd., 617 S.W.3d 792, 802 (Ky. 2020) ("Person includes the state unless the context of the statute requires otherwise. The context of the statute requires a determination that the Commonwealth of Kentucky has standing to bring this lawsuit.").

235. Coinbase was a "winner" with respect to all sports wagering on the Coinbase prediction market hub by persons in Kentucky because it received a percentage of, or fee on, each such wager. See Stars Interactive, 617 S.W.3d at 807 ("Our Court has interpreted winners to include individuals who take any portion of the amount lost since at least 1890.").

236. For all individual sports wagering losses of five dollars or more within a twenty-four hour period by persons wagering in Kentucky, and for which the loser did not sue for money lost and prosecute the suit to recovery with due diligence under KRS 372.040, the Commonwealth seeks from Coinbase, and is entitled to receive, treble the value of the money lost.

**COUNT 16**
**VIOLATION OF KRS 528.100**
**(ASSERTED AGAINST COINBASE FINANCIAL MARKETS, INC.)**

237. Plaintiff repeats and realleges paragraphs 1-117 of this Complaint as if fully set forth herein.

238. Pursuant to KRS 528.100(2), "any person who conducts, finances, manages, supervises, directs, or owns a gambling device intended for use in the Commonwealth in violation of [Chapter 528 of the Kentucky Penal Code] shall be subject to a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each device, payable to the county in which the device was operated."



92FB4D40-862E-4579-900B-6D10A3229023 : 000053 of 000056

239. Pursuant to KRS 528.100(3), the Attorney General "may cause an action in equity to be brought in the name of the Commonwealth . . . . [to] enjoin the operation of a gambling device in violation of this section."

240. A "gambling device" is defined, in relevant part, as "[a]ny electronic, computerized, or mechanical contrivance, terminal, machine, or other device that: (a) Requires the direct or indirect payment of consideration which may include and shall not be limited to the insertion of a coin, currency, ticket, token, or similar object, or by depositing funds with the operator or owner of the device, to operate, play, or activate a game; and (b) Offers games the outcomes of which are determined by any element of skill of the player and may deliver or entitle the person playing or operating the device to receive cash, cash equivalents, or gift cards or vouchers, billets, tickets, tokens, or electronic credits to be exchanged for cash or to receive merchandise or something of value, whether the payoff is made automatically from the device or manually." KRS 528.010.

241. The Coinbase website and mobile apps, through which Coinbase offers its prediction market hub, are gambling devices under KRS 528.010.

242. With the Coinbase website and mobile apps, Coinbase conducts, finances, manages, supervises, directs, and owns gambling devices intended for use in the Commonwealth in violation of Chapter 528 of the Kentucky Penal Code.

243. The Commonwealth seeks, and is entitled to, an order enjoining the operation of Coinbase's gambling devices and a penalty of twenty-five thousand dollars ($25,000) for each device, payable to the county in which the device was operated.

92FB4D40-862E-4579-900B-6D10A3229023 : 000054 of 000056

## VI. DEMAND FOR RELIEF

WHEREFORE, Plaintiff, the Commonwealth of Kentucky, respectfully requests that the Court enter judgment in its favor and against Defendants, as follows:

a. Entering an Order finding that the Defendants have violated the Kentucky Consumer Protection Act, the Kentucky Loss Recovery Act, and KRS 528.100, and that judgment be entered against Defendants in favor of Plaintiff;

b. Granting Plaintiff all recoverable measures of damages—including but not limited to actual and punitive damages—allowable under the claims identified herein;

c. Awarding Plaintiff penalties of up to $2,000.00 per willful violation of the KCPA pursuant to KRS 367.990;

d. Awarding civil penalties of $10,000 for each violation of the Kentucky Consumer Protection Act pursuant to KRS 367.990, where Defendants' conduct was directed at a person aged sixty (60) years of age or older;

e. Awarding Plaintiff temporary and permanent injunctive relief against Defendants' ongoing violations of the KCPA;

f. Awarding restitution and/or disgorging Defendants' unjust gains pursuant to KRS 367.200, KRS 15.020, and common law;

g. Awarding treble the value of all money lost to Defendants pursuant to KRS § 372.040;

h. Entering an Order temporarily and permanently enjoining Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from, in any manner, continuing, maintaining or renewing the conduct, alleged herein, in violation of the above stated Kentucky laws;



92FB4D40-862E-4579-900B-6D10A3229023 : 000055 of 000056

i. Awarding the Commonwealth its costs and attorneys' fees as permitted by law;

j. Awarding the Commonwealth prejudgment interest as permitted by law;

k. Ordering such other and further relief as the Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

DATED: June 17, 2026

Respectfully submitted:

By: /s/ Daniel Keiser

Daniel Keiser (KBA No. 100264)
Alex Scutchfield (KBA No. 87009)
Philip Heleringer (KBA No. 96748)
J. Christian Lewis (KBA No. 87109)
Justin Clark (KBA No. 89313)
Office of the Attorney General
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Phone: (502) 696-5300
daniel.keiser@ky.gov
alex.scutchfield@ky.gov
philip.heleringer@ky.gov
christian.lewis@ky.gov
justindclark@ky.gov

Adam J. Levitt *admission pro hac vice to be sought*
Daniel R. Ferri *admission pro hac vice to be sought*
Joseph Nelson, Jr. *admission pro hac vice to be sought*
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com
dferri@dicellolevitt.com
jnelson@dicellolevitt.com

*Attorneys for the Commonwealth of Kentucky*



92FB4D40-862E-4579-900B-6D10A3229023 : 000056 of 000056